IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Crim. No.23CR086 (RCL) |
| v. : | |
| : | |
| CAMERON HESS : | |
| : | |

    *(defendant)*

**SENTENCING MEMORANDUM IN SUPPORT OF CAMERON HESS**

    Mr. Hess unequivocally states he is ready to "accept [what ever] judgment is pass[ed] on to him and imposed. However, there is a reality which he downplays to the Court that being his health. As his mother had previously described to undersigned during the initial phase of the case, a jail sentence would cause havoc on the already delicate balance his health teeters on.[1] Even during this case, early on he had a health issue probably brought on by stress, that caused him to be hospitalized for a short period.[2] Mr. Hess grew up going in and out of hospitals. Suffering from IPEX syndrome, a rare immune disease put him at risk of various other aliments. The first three years of his life, he lived in a hospital. See Mr. Hess' letter. He had various surgeries while a child including a bone transplant when he was about 14-15 yrs old. There were many times when his mother was unsure he

---

[1] See Presentence Report #62-64, for a full documentation of the myriad of health issues he has been diagnosed with and the various medications he has taken and been prescribed.
[2] See ECF # 12.

would live.  See Pre-Sentence Report ("PSR") #61.  He was prescribed many medications and he lived a relatively inactive life, and had few friends.  He was home schooled during much of his highschool because of his health issues and constant hospitalizations.  Because of his chronic illnesses, he endured "[l]ong periods of … isolation" leading to depression and anxiety. See Hess' letter.  All of this effected his development and his ability to navigate social situations effectively.  See his mother, Michel Burke's letter.

He is mentally stronger since the early days of his arrest in this case.  He has made great strides in his life during the pendency of this case, and even before his arrest but after January 6.  He has been able to develop and maintain a lasting romantic relationship with a romantic partner.  He and his girlfriend moved in together and continue to reside together as a couple.  This is a great leap forward from his days of isolation, depression, self-doubt, and awkwardness.[3]  His Friend Nikolas M. Daub recounts that "[h]is terminal illness made it challenging for him to see a brighter future."  See letter of Nikolas M. Daub.  More recently, Mr. Daub notes he has "observed a remarkable change in Cameron's behavior and outlook on life."  By actively seeking "help and support to cope with his past traumas," Id., he has demonstrated progressive maturing and success in his journey to address his mental health and his well being.

---

[3] The discovery in this case provided the following descriptions of Hess by those who knew him in middle school or the highschool years:   He was awkward, quiet, an outcast, who kept to himself and made females uncomfortable, who was supposed to die young and was susceptible to influence.

2

As Mr. Hess describes in his letter to the Court, since January 6, he has "worked very hard on [his] physical and mental health." The results are evident by the complete changes in his life. Prior to January 6, he felt he had no real future. He was living at home, relying on family and Government social security disability benefits. By September 2022, he saw his life and himself in a different perspective and was ready to leave home and start a career. Since that time period until his arrest in this case, he was employed, working in various capacities on boats. After his arrest, he resigned from working on American Cruise Lines as a deckhand. This was very hard for him as he realized he "love[d] .. working on boats," and hopes when this case is finally over he can once again pursue a career connected to boating. See PSR #80, Hess' letter. It took him a few months to find another career option after leaving American Cruise Lines but he pursued work opportunities and in July 2023, began working in a nursing home, and then in September he began a second job as a server for a Catering company. PSR #77 ,78, The catering position has high and low seasons and the winter months are a low season, so Mr. Hess has been seeking to fill the gap with other employment. The take away is that Mr. Hess is a very different person now than he was on January 6, 2021, when he agreed to join his friend and come down to DC. He is not the same young immature 23 year old who got caught up in the heat of the moment, the frenzy of the crowd, and stepped into the US Capitol and tried to push his way past the door entrance, although not getting very far, and being pushed at various times from behind by others, he was finally able to exit out after not being inside the entrance vestibule

very long, less than 4 minutes.[4] He acknowledges the altercation at the door. He recalls it started when he saw a guy getting pulled inside. He tried to hold the door open despite officers trying to close it. It was during this point in time when trying to keep the door open that his body came in contact with that of the officer. He now fully recognizes the impropriety of his actions. He admits his actions were "unjustified and inappropriate." See Hess' letter. He sincerely "apologizes to anyone harmed that day." Id.



Before leaving the area, Hess is crouching on his own, to the left of persons congregating in front of the door.

In many ways, January 6, was a wakeup call for Mr. Hess. It served as a turning point. After that, he chose to take the high road in his life, recognizing that

---

[4] Review of the videos in discovery show he entered around 15:24:57, and exited at 15:28:40. A period of a little less than 4 minutes. At around 15:30:06 he grabs the door and holds onto the door. It appears that by 15:30:16, he is no longer holding onto or at the door and he is outside of the Capitol building. The door event began and ended in 10 seconds.

he was still alive even in his 20s and he had not succumbed to the various illnesses he dealt with while growing up.  He realized he can have a better life and be a better person to the community at large.  His family points that Cameron is now described as someone who wants to help others.  The types of work he has chosen are "positions to help and serve others."  See Letter of Don Longenecker.  He is seen to be someone who shows respect and thoughtfulness to others.  See letter of John D. Chadwick.

I. **Procedural Background**

Mr. Cameron Hess was arrested without incident.  Law enforcement reached out to him by telephone and he turned himself into police on March 1, 2023.  He was released on his personal recognizance and has been on pre-trial release since March, 2023.  He has remained in full compliance with pre-trial conditions.

On October 6, 2023, Mr. Hess entered a guilty plea to Count 1 of the indictment charging him with Civil Disorder in violation of 18 U.S.C. §231(a)(3).

Sentencing is currently scheduled on February 26, 2024.

II. **Statutory Framework/Guidelines**

The offense of Civil Disorder in violation of 18 U.S.C. §231(a)(3), carries a maximum sentence of not more than 5 years and a fine of not more than $250,000. There is no mandatory minimum.

The base offense level under the United States Sentencing Guidelines is a level 10, three points are added for an offense involving physical contact.  A two level downward adjustment for acceptenace of responsibility is warranted   A reduction of

two levels is further warranted under the new guideline §4C1.1, as Mr. Hess has zero criminal history points having never been previously arrested or convicted. The resulting offense level is a level 9. The guideline recommendation for an offense level 9, criminal history category I, is 4 to 9 months.

The Government opposes the application of U.S.S.G. §4C1.1, arguing that the defendant does not qualify because "he used violence when he pushed Officer E.C. while confronting him in the East Rotunda doorway." Govt. Sent. Memo, ECF#37 at 8. However, Hess' actions do not rise to a level of "violence." In support of their position, the Government claims that Hess' actions are similar to Bauer's, in *United States v. Bauer,* 21cr386-2 (TNM), Mem. Op., ECF No. 195. In that case Judge McFadden, who found Bauer guilty after a bench trial, denied the 2 point reduction finding that Bauer pushed at the officer while also yelling at him "fuck you, you fucking bitch." *Id* at. 5. Judge McFadden further noted that Bauer repeatedly yelled at police officers "demanding that the officers bring out members of Congress, including Speaker Nancy Pelosi," who she said "[t]hey need to hang." *Id* at 2. Bauer also shoved at least one police officer while yelling to the officer "'[y]ou back up! Don't' even try," and "pushed back against [an officer's] baton' using both hands and told him to 'back up." *Id*. The Bauer actions go far beyond Hess's actions. Judge McFadden denied the application of §4C1.1 not merely because she pushed officers but because her "vehement tone and abusive language emphasized the seriousness of her physical actions against" the officer." *Id*. Because of verbal language and the tone in which she spoke to the officer, Judge McFadden found that "she used force

6

accompanied by fury and vehemence with the intent to harm or abuse" the officer.[5] We do not have the same circumstances here. Hess had one very short interaction with officers in which he said nothing to them. At no time did he say any argumentative or fighting words to officers at the door.

As Judge Bates very recently noted on February 9 of this month, [n]either 4C1.1 nor other provisions in the Guidelines define the terms 'use violence.'" *United States v. Yang*, 1:23-cr-00284 (JDB), Memo Op., ECF No. 33, at 6. In *Yang,* Judge Bates referred to contemporary dictionary definitions that define violence as "'[t]he use of physical force, usu[ally] accompanied by fury, vehemence, or outrage; esp[ecially], physical force unlawfully exercised with the intent to harm,'" or as "'the use of physical force so as to injure, abuse, damage, or destroy." *Id*. (citations omitted). In deciding that §4C1.1 applied to defendant Yang, who like Mr. Hess plead guilty to Civil Disorder, in violation of 18 U.S.C. 231(a)(3), the Court found that even though Yang made physical contact with two officers, including briefly grabbing an officer's wrist and later grabbing an officer's baton, "this contact was not made with an intent to harm." Nor did the Court find that Yang's actions were accompanied by "fury, vehemence, or outrage." Similarly, here §4C1.1 applies as the contact was not made with the intent to injure nor accompanied by fury, vehemence or outrage. Mr. Hess' contact with the officer occurred when he was at the door pulling on the door trying to prevent officers from closing the door. He then appears

---

[5] Undersigned has watched some of the videos of Bauer due to representing a different defendant in a different case, with whom Bauer was with during part of her time at the Capitol. She is clearly seen in a fighting aggressive mode during the recordings. An another individual she was with, at one point had to restrain her physical actions against law enforcement.

to have gotten caught between the door, the officers and another individual for a few seconds until, he was able to free himself and he stumbled back.

### III. Additional Sentencing Factors Pursuant to 18 U.S.C. §3553

Mr. Hess moves this court to sentence him to home confinement for six months and then 1 year of probation. Such sentence amounts to a "reasonable" sentence in this case. A sentence of jail time would be overly punitive, unreasonable, and is not warranted in this case. In conjunction and consideration of the other §3553(a) sentencing factors the court must take into account, such a sentence is reasonable and just.

**(a) Reflect seriousness of the offense and promote respect for the law, 18 U.S.C. §3553(a)(2)(A)**

Such sentence does reflect seriousness, it impinges upon the freedom of Mr. Hess to come and go as he pleases and requires he abide by supervision in the community. The charge here does not carry a mandatory minimum sentence and zero jail time is permitted.

**(b)    Deterrence**

**General Deterrence**

January 6, was an unusual day. It came at a time after various lootings and acts of property destruction that others caused during their demonstrations in places like Seattle, DC and other areas around this country. There have been more

than 1,265[6] people charged for their presence and actions on January 6. Hundreds have been sentenced. Those involved on January 6 did not expect to be arrested. The mere knowledge that one can and will be arrested for such activity has in and of itself a deterrent effect in addition to the understanding that more than 460 have received sentences of incarceration and that there may be other consequences including a sentence of home confinement.

### Specific Deterrence

Mr. Hess has shown through his compliance with his pretrial conditions as well as the many changes he has made in his life and the progresses he has achieved in his employment, his mental health, his living situation and personal life that he has learned his lesson such that deterrence concerns should be negliable at this point. His family believes that because all that he went through as a child stilled his development it played a role in his behavior and decision-making on January 6. See Burke's letter.

He has no intention of participating, getting involved or joining any friends in political activity. The friend with whom he came down to DC is no longer someone he communicates with. As his heart felt letter explains he recognizes his errors, he is embarrassed and has no intention of becoming involved in such activity in the future. His life's trajectory shows he is going in a completely different direction. He sees a future for himself, he has emotional support in his personal life, has found employment he is passionate about, and he is setting goals.

---

[6] https://abcnews.go.com/Politics/3-years-jan-6-numbers-1200-charged-460/story?id=106140326

To respond to the prosecution's view, Mr. Hess does not hide behind his friend to mitigate the actions he took at the Capitol. He merely states that his friend did have a role in his presence at the Capitol. But beyond that, Hess takes full responsibility for the actions he took while at the Capitol. Hess further acknowledges that he initially boasted.[7] A man may not see the folly of his actions until he has had time to fully reflect, understand the larger picture, and change his mental state. Here, Mr. Hess has done just that and now is not only sorry but also embarrassed by his actions. The prosecution wants to ignore this by emphasizing Hess' initial response some two plus years ago. But Hess can change and he has. To neither recognize this nor accept this would cause an unjust and incorrect determination relative to the deterrence sentencing factor.

**(c) Unwarranted Disparity**

The sentence the Prosecution urges of 12 months would cause an unwarranted disparity on Mr. Hess.

The Prosecution cites to *United States v. Nolan Cooke*, 22-cr-52 (RCL), to support their position that a sentence of 12 months does not cause an unwarranted sentencing disparity vis a vis others who plead guilty to U.S.C. 231(a)(3). The sentence the Court imposed in Cooke, 366 days (one year and one day), results in an 8 month sentence, four months less than the sentence the Government asks for

---

[7] He probably also exaggerated.

10

here.  Hence, even the case they cite as most similar to Mr. Hess, supports a lower sentence than what the Government requests.  However, in reality, Cooke's actions were far more involved and egregious than Hess.'  The prosecution's pleading describes Cooke's actions to include the following:  helped to lead the charge of rioters who broke through the police line; he and other rioters struggled with police officers protecting the restricted area; shoved through a group of U.S Capital Police; pushed against the bicycle rack barrier manned by police and encouraged other rioters to break through the police line, yelling obscenities; chased officers as they ran to the top of the Capitol steps; carried a flagpole carrying an American flag to strike one of the Capitol windows and encouraged others rioters to smash the windows and break the glass; holding the flagpole, pushed against officers who struggled to contain the crowd; grabbed the edge of the Columbus doors before being forced back; his actions enabled other rioters to continue the assault on the Capital.  See ECF #52 of 22-cr-52 (RCL), at 2, 6, 19, 25.  Hess warrants a sentence far less than Cooke's, as Hess' actions were considerably less involved.

      Other cases in which defendants similarly plead guilty to one charge of §231(a)(3) warrant consideration.  This Court sentenced Corinne Montoni to 30 days incarceration and 24 months supervised release.  The prosecution had asked for 3 months incarceration and 36 months supervised release.  In the Government's sentencing memorandum they described Montoni's actions to include the following: she entered the Capitol twice, first through the broken Senate Wing Door and then later again even after she knew police were attempting to remove all rioters; once

11

inside she joined in pushing against police officers who were trying to stop them; encouraged fellow rioters to "push back;" placed a sticker on the back of a police officer; entered various rooms in the Capitol; used her phone to record videos which she posted on social media; she posted messages on Instagram Facebook and Parler advocating for the removal of member of Congress and Vice President Pence but later deleted her posts.  23-cr-00195 (RCL), ECF # at  2, 8, 10.

Larry Giberson was sentenced to 2 months incarceration followed by six months of supervised release to be served as home detention.  23cr00115-CJN. The Government had requested an 11 month sentence.  The Government's sentencing memorandum described Giberson's actions to include the following: entered the tunnel and moved directly towards the front pack of the rioters in the tunnel while others assaulted police officers using chemical spray and various objects; while in the tunnel he and others attempted to create a wall of stolen police shields against the line of police officers; with a fellow rioter attempted to pull a shield away from the front line of police officers; when he retreated to the mouth of the tunnel he ushered other rioters into the tunnel towards the front of the police line; pushed at least 10 other rioters into the tunnel, urged others forward; returned back inside the tunnel where he participated in the coordinated pushing against the police; observed the assault of Officer M.F. Giberson; attempted to start the chant "drag them out" while observing a violent individual use a pole to stab at the line of police. 23-cr-0011 (CJN), ECF # at 2, 7, 8, 9, 11-12.

12

In Brian Preller's case, 23-cr-45 (TNM), the government asked for 8 months and described Preller as a member of the Guardians of Freedom, an organization loosely affiliated with the Three Percenters. The prosecutors memo described him to include the following: came to the Capitol wearing large goggles, green helmet, green tactical vest, appearing to have a chemical irritant spray in front of his vest and carried a black walking stick; entered the tunnel, while in the tunnel appeared to hold a can of chemical irritant, confronted and assisted others in confronting police officers in the Tunnel by adding his force, momentum and effort to the "heave-ho;" posted several statements on social media acknowledging his involvement. 23-cr-45 (TNM), ECF #90 at 2, 3, 5, 7. Preller received a sentence of 60 months probation with 8 months location monitoring.

In *United States v. Lints*, 22cr259 (TNM), the Government requested 10 months but Lints was sentenced to 4 months incarceration and 4 months home detention. The prosecution's sentencing memorandum described Luke Lints' actions to include the following: entered the tunnel and pushed his way past others towards the front of the police line; at the front of the "heave ho" against police officers; obtained a police shield which he used to push against officers guarding the entrance to the Capitol; **blocked the closing of a metal door while an officer attempted to shut the metal door to create a barrier between the rioters and police; used the stolen shield to push back against an officer**; after giving the first police shield to someone else, he passed a second police shield forward to someone else, and obtained a third stolen police shield which he used to

13

rush toward the police line; provided a false narrative on social media stating he was a peaceful protestor trying to prevent police from attacking the rioters and gave a podcast interview continuing to claim a false narrative.  22-cr-259 (TNM), ECF #58, at 3, 4, 5, 7, 8.

In *United States v. David Alan Blair*, the Government requested a sentence of 8 months incarceration and Blair was sentenced to 5 months incarceration followed by 18 months supervised release.  21-cr-186 (CRC).  Blair also had direct physical contact with an officer.  The prosecution argued in support of their sentence by describing Blair's conduct to include the following:  he came to the Capitol grounds wearing a skull-themed neck gator which he pulled over his face, wore tactical gloves, carried a lacrosse stick, and wore a backpack that contained a knife and a roll of duck tape; did not comply with verbal commands of multiple officers to leave the Lawn and encouraged others to do the same; **pushed his lacrosse stick against a police officer's chest**. 21-cr-186 (CRC) ECF #55, at 1-2.

In *United States v. Robert Fairchild*, Jr., 21-cr-00551 (TFH), the Government requested an 11 month sentence.  Fairchild, Jr.  was sentenced to 6 months incarceration.  In the prosecution's sentencing memorandum they described his actions to include the following:  Fairchild was at the Capitol for a good 2 hours on the West Plaza area; he witnessed extreme acts of violence against police and made repeated attempts to wrest the metal barriers away from officers; he initiated an effort and then assisted by others in pulling the barrier away from officers and back into the crowd; **aggressively pushed officers backward** and then continued to

14

push the line of officers backward with the weight of the crowd pushing behind him; pulled away another barrier during a lull in the commotion; at other moments appeared to be looking for other opportunities to press forward; after an hour in the West Plaza, **he tried to press forward and used his back and shoulder to press a barrier and the officer standing behind it**; after two hours on the restricted grounds he entered the Capitol through a door with a broken glass; chanted while inside the Capitol and walked into the Crypt area; he exited 17 minutes after he entered.  21-cr-00551 (TFH), ECF # 39 at 12, 14, 17, 22, 23.

Finally, in *United States v. Geoffrey Shough*, 22-cr-197 (DLF), ECF #33, the prosecution asked for 11 months but Slough was sentenced to 6 months incarceration followed by 12 month of supervised release.  The Government's sentencing memorandum described Shough as a former Department of Defense contractor who wore tactical gear including a body army vest, ballistic-style helmet with an Oath Keepers decal on the back, and hard knuckle gloves; cheered on other rioters as they assaulted and overran law enforcement; forcibly entered the Capitol building as one of the first individuals in a group that pushed through, violently overwhelmed, and **made physical contact** with a line of uniformed officers who were attempting to prevent the rioters from entering during the second breach of the Senate Wing Door; verbally interacted with officers telling them to go home etc.; and remained inside the Capitol 15 minutes after traveling to multiple locations within the building.  22-cr-197 (DLF), ECF #33 at 2, 6, 9, 10.

When considering the cases noted above, Mr. Hess' actions are less involved and for a much shorter time period. Mr. Hess would receive an unwarranted sentencing disparity if sentenced to the prosecution's suggested sentence but also even if sentenced to more than 4 months incarceration. What differentiates Mr. Hess further from all of the others is his youthful age and the great strides of change he has made in both his mental and physical well being since January 6.

It is also worth noting the pre-sentence report's useful information relative to the average and median sentences imposed for defendants under the 2A2.4 guideline scheme with a final Offense level of 11, Criminal history Category I. For all 170 defendants during the past five years, the average sentence imposed was 6 months and the median was 7 months. See PSR, #125. As Mr. Hess' final Offense level should be 9 rather than 11, the average and median numbers would result in sentences lower than those listed in paragraph #125.

IV. **CONCLUSION**

For all the reasons provided, including Ms. Hess' complete turn around in his mental and emotional wellbeing, his remorse, his limited physical interaction with an officer and extremely short time period in the Capitol (4 minutes, then 10 seconds at the door); his youthful age on January 6, and a comparison to other §231(a)(3) cases, a sentence of home confinement for six months and then 1 year of probation is a just, reasonable and appropriate punishment.

Respectfully submitted,

/s/

_____

Elita C. Amato
D. C. Bar # 442797
2111 Wilson Blvd., 8th Floor
Arlington, VA 22201
703-522-5900

## CERTIFICATE OF SERVICE

I hereby certify that this Motion is filed electronically through the ECF filing system on this 19th day of FEBRUARY 2024, thereby, providing service electronically upon all parties in this case

/s/
_____
Elita C. Amato

Respectfully submitted,

/s/

_____

Elita C. Amato
D. C. Bar # 442797
2111 Wilson Blvd., 8th Floor
Arlington, VA 22201
703-522-5900

## CERTIFICATE OF SERVICE

I hereby certify that this Motion is filed electronically through the ECF filing system on this 19th day of FEBRUARY 2024, thereby, providing service electronically upon all parties in this case

/s/
_____
Elita C. Amato